COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
  
NO. 2-02-179-CV
 
  
SHARON E. JONES                                                                APPELLANT
 
V.
 
AMERICAN AIRLINES, INC. AND                                              APPELLEES
AMERICAN AIRLINES, INC. PILOT
RETIREMENT BENEFIT PROGRAM
 
------------
 
FROM THE 153RD DISTRICT COURT 
OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
        Appellant 
Sharon E. Jones appeals from a turnover order directing her to pay $410,540.32, 
plus any post-judgment interest, into the registry of the court for the benefit 
of Appellees American Airlines, Inc. and American Airlines, Inc. Pilot 
Retirement Benefit Program. Jones challenges the turnover order in two issues, 
arguing that the trial court erred in its implied findings (1) that her 
Individual Retirement Account (“IRA”), into which the pension fund payments 
were rolled over, did not qualify under the Internal Revenue Code and (2) that 
the funds ordered turned over by the trial court were not exempt under Texas law 
from turnover as the proceeds of exempt property. We affirm.
I. Factual and Procedural Background
        In 
1995, Sharon Jones divorced Leslie Jones, who had a pension plan with Appellees. 
As part of the divorce proceedings, the divorce court entered a Qualified 
Domestic Relations Order (QDRO), under which Appellees were to pay a portion of 
Mr. Jones’s pension funds to Appellant with interest. See Tex. Fam. Code Ann. §§ 9.101-9.105 
(Vernon 1998) (governing post-decree QDROs). Mr. Jones filed a lawsuit against 
Appellees in the United States District Court in Fort Worth, Texas, under the 
Employee Retirement Income Security Act of 1974 (ERISA). See 29 U.S.C.A. 
§§ 1001 et seq. (1999 & Supp. 2003). Under ERISA, in the event of a 
divorce, benefits due under the terms of an ERISA plan may be transferred to a 
participant’s former spouse according to the terms of a valid QDRO. Id. 
§ 1056(d)(3)(A); Day v. Wall, 112 F. Supp. 2d 833, 836 (E.D. Wis. 2000). 
Mr. Jones asserted that Appellees wrongfully paid benefits to Appellant, instead 
of paying them to him. Appellees joined Appellant as a third-party defendant to 
the federal lawsuit, contending that if proceeds had been wrongfully paid to 
Appellant, they were entitled to equitable reimbursement from her.
        Appellees 
settled with Mr. Jones and proceeded to trial on their third-party claims 
against Appellant. After a trial to the bench, the federal court ruled for 
Appellees on their claims against Appellant and found that Appellees were 
entitled to recover $410,540.32 in mistakenly paid benefits:
  
I find that Sharon Leutwyler, 
then Sharon Jones, equitably should be required to repay defendant’s -- the 
plan benefits she was overpaid, that is, the $167,445.67 and the $243,094.65. I 
don’t think she suffered any detrimental reliance by reason of the 
overpayment. . . . I find that Sharon knew that there was a dispute as [to] the 
amount Jones, her husband, should receive and the amount she should receive. And 
she knew that before she received any payments and should have taken that into 
account in whatever planning she engaged in.[1]

  
        The 
federal court signed a judgment in accordance with its ruling, awarding 
Appellees $410,540.32, plus post-judgment interest. Appellant did not appeal the 
federal court’s judgment. After Appellees learned through post-trial discovery 
that Appellant had withdrawn and transferred $463,128 to various accounts in the 
weeks leading up to the federal trial, the parties entered an agreed injunction 
on August 30, 2001, which froze all of Appellant’s retirement accounts, 
including, but not limited to, accounts she held at Securities America, Inc., 
Morgan Stanley Dean Witter, and Wells Fargo Bank, N.A.
        Appellees 
initiated collection proceedings in the federal court, but the federal court 
declined to further exercise jurisdiction over the matter. See United Mine 
Workers v. Gibbs, 383 U.S. 715, 725, 86 S. Ct. 1130, 1138 (1966) (discussing 
the doctrine of pendent jurisdiction). Consequently, Appellees filed an 
application for a turnover order in the 153rd District Court of 
Texas. See Tex. Civ. Prac. & 
Rem. Code Ann. § 31.002 (Vernon Supp. 2004). Appellant filed an answer 
in which she asserted that the funds were exempt from turnover proceedings under 
section 31.002(f) of the Texas Civil Practice and Remedies Code and section 
42.0021 of the Texas Property Code. See id. § 31.002(f); Tex. Prop. Code Ann. § 42.0021 (Vernon 
2000).
        After 
a hearing on Appellees’ petition, the court signed a turnover order, which 
required Appellant to turn over to the registry of the court $410,540.32 plus 
post-judgment interest. The order also awarded attorneys’ fees to Appellees in 
the amount of $35,000 plus conditional appellate attorneys’ fees.[2]  No findings of fact and conclusions of law were 
requested or filed. Appellant timely filed her notice of appeal.[3]
II. Issues on Appeal
        In 
two issues, Appellant complains that the trial court erred (1) by its implied 
finding that her IRA did not qualify under the applicable provisions of the 
Internal Revenue Code and (2) by its implied finding that the funds ordered 
turned over were not exempt from turnover as the proceeds of exempt property. We 
construe Appellant’s arguments under these two issues as a challenge to the 
legal sufficiency of the evidence supporting these implied findings. Appellees 
respond that the trial court did not abuse its discretion in rejecting the 
exemption claims of Appellant to the mistakenly paid benefits and ordering 
turnover relief. Appellees have also requested appellate attorneys’ fees.
III. Texas Turnover Statute and Texas Property Code Section 42.0021
        As 
we stated in Dale v. Finance America Corp., “The Texas ‘turnover’ 
statute . . . is a procedural device by which judgment creditors may reach 
assets of a debtor that are otherwise difficult to attach or levy on by ordinary 
legal process.” 929 S.W.2d 495, 498 (Tex. App.—Fort Worth 1996, writ 
denied); see Tex. Civ. Prac. & 
Rem. Code Ann. § 31.002. The turnover statute provides for turnover 
relief as follows:
  
(a) A judgment creditor is 
entitled to aid from a court of appropriate jurisdiction through injunction or 
other means in order to reach property to obtain satisfaction on the judgment if 
the judgment debtor owns property, including present or future rights to 
property, that:
 
(1) cannot readily be attached 
or levied on by ordinary legal process; and
 
(2) is not exempt from 
attachment, execution, or seizure for the satisfaction of liabilities.

  
Tex. Civ. Prac. & Rem. Code Ann. § 
31.002(a). However, “[a] court may not enter or enforce an order under this 
section that requires the turnover of the proceeds of, or the disbursement of, 
property exempt under any statute, including Section 42.0021, Property Code.” Id. 
§ 31.002(f).
        Section 
42.0021, entitled “Additional Exemption for Retirement Plan,” provides in 
pertinent part:
  
(a) In addition to the 
exemption prescribed by Section 42.001, a person’s right to the assets held in 
or to receive payments, whether vested or not, under any stock bonus, pension, 
profit-sharing, or similar plan, including a retirement plan for self-employed 
individuals, and under any annuity or similar contract purchased with assets 
distributed from that type of plan, and under any retirement annuity or account 
described by Section 403(b) or 408A of the Internal Revenue Code of 1986, and 
under any individual retirement account or any individual retirement annuity, 
including a simplified employee pension plan, is exempt from attachment, 
execution, and seizure for the satisfaction of debts unless the plan, contract, 
or account does not qualify under the applicable provisions of the Internal 
Revenue Code of 1986. . . .
 
(b) Contributions to an 
individual retirement account . . . and any accrued earnings on such 
contributions are not exempt under this section unless otherwise exempt by law. 
. . . In addition, amounts qualifying as nontaxable rollover contributions under 
Section 402(c), 402(e)(6), 402(f), 403(a)(4), 403(a)(5), 403(b)(8), 403(b)(10), 
408(d)(3), or 408A of the Internal Revenue Code of 1986 on or after January 1, 
1993, are treated as exempt amounts under Subsection (a).

  
Tex. Prop. Code Ann. § 42.0021(a), (b). 
The legislature enacted section 42.0021 in 1987 in response to federal decisions 
holding that the benefits of retirement plans held by debtors in bankruptcy 
proceedings were not protected from the claims of creditors in Texas. Tex. Prop. Code Ann. § 42.0021; see, 
e.g., In re Goff, 706 F.2d 574, 587-88 (5th Cir. 1983) (holding 
that the retirement plan benefits were property of the bankruptcy estate, where 
no Texas law exempted those benefits from creditor’s claims); In re Brooks, 
60 B.R. 155, 160 (Bankr. N.D. Tex. 1986) (ruling that debtor’s interest in a 
retirement plan was not exempted from the bankruptcy estate under Texas law); see 
also M. Bruce Peele, Retirement Plan Benefits–Are they Exempt, 53 Tex. B.J. 114, 114-115 (discussing Goff 
and the enactment of section 42.0021 of the property code).
        As 
one commentator had observed, section 42.0021 “is designed to protect 
retirement benefits from the claims of creditors,” including judgment 
creditors. Katherine C. Hall, Retirement Benefits: Texas Property Code 
Amendment, 50 Tex. B.J. 993, 
993 (1987). However, this protection is not without limits. While section 
42.0021 was enacted “to protect the unwary debtor from having his [or her] 
retirement funds seized for payment of past debts,” it was not intended to 
“become a safe-haven for sham retirement plans created to defraud 
creditors.” Joseph V. Gote, The Texas Exemption of Retirement Benefits: 
Interaction with the Bankruptcy Code and Possible Preemption by Mackey v. Lanier 
Collections Agency and Service, 50 Hous. 
L. Rev. 497, 515 (1989). Thus, if a debtor places funds in a retirement 
plan in an attempt to defraud his or her creditors, those creditors “can still 
exercise their rights [concerning those funds] . . . regardless of the type of 
retirement plan or the amount of deductible or excess contribution involved.” 
Hall, 50 Tex. B.J. at 994.
IV. Standard of Review
        We 
review a trial court’s application of the turnover statute under an abuse of 
discretion standard. Beaumont Bank, N.A. v. Buller, 806 S.W.2d 223, 226 
(Tex. 1991); DeVore v. Central Bank & Trust, 908 S.W.2d 605, 608 
(Tex. App.—Fort Worth 1995, no writ). Under an abuse of discretion standard, 
legal and factual insufficiency challenges do not constitute independent grounds 
of error, but are factors we examine in assessing whether the trial court abused 
its discretion. DeVore, 908 S.W.2d at 608.
        To 
determine whether the trial court abused its discretion, we must decide whether 
a trial court acted without reference to any guiding rules or principles; in 
other words, whether the act was arbitrary or unreasonable. See Carpenter v. 
Cimarron Hydrocarbons Corp., 98 S.W.3d 682, 687 (Tex. 2002); Downer v. 
Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985), cert. 
denied, 476 U.S. 1159 (1986). Merely because a trial court may decide a 
matter within its discretion in a different manner than an appellate court would 
in a similar circumstance does not demonstrate that an abuse of discretion has 
occurred. Downer, 701 S.W.2d at 241-42. Further, an abuse of discretion 
does not occur as long as some evidence of a substantive and probative character 
exists to support the trial court’s decision. DeVore, 908 S.W.2d at 
608.
        In 
a trial to the court where no findings of fact or conclusions of law are filed, 
the trial court’s judgment implies all findings of fact necessary to support 
it. Pharo v. Chambers County, 922 S.W.2d 945, 948 (Tex. 1996). Where a 
reporter’s record is filed, however, these implied findings are not 
conclusive, and an appellant may challenge them by raising both legal and 
factual sufficiency of the evidence issues. Roberson v. Robinson, 768 
S.W.2d 280, 281 (Tex. 1989). Where such issues are raised, the applicable 
standard of review is the same as that to be applied in the review of jury 
findings or a trial court’s findings of fact. Id.
        In 
determining a “no-evidence” issue, we are to consider only the evidence and 
inferences that tend to support the finding and disregard all evidence and 
inferences to the contrary. Bradford v. Vento, 48 S.W.3d 749, 754 (Tex. 
2001); Cont’l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 
1996); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). 
Anything more than a scintilla of evidence is legally sufficient to support the 
finding. Cazarez, 937 S.W.2d at 450; Leitch v. Hornsby, 935 S.W.2d 
114, 118 (Tex. 1996). More than a scintilla of evidence exists if the evidence 
furnishes some reasonable basis for differing conclusions by reasonable minds 
about the existence of a vital fact. Rocor Int’l, Inc. v. Nat’l Union 
Fire Ins. Co., 77 S.W.3d 253, 262 (Tex. 2002).
        Where 
the implied findings of fact are supported by the evidence, it is our duty to 
uphold the judgment on any theory of law applicable to the case. Worford v. 
Stamper, 801 S.W.2d 108, 109 (Tex. 1990); Point Lookout West, Inc. v. 
Whorton, 742 S.W.2d 277, 278 (Tex. 1987). We must uphold the judgment 
regardless of whether the trial court articulates the correct legal reason for 
the judgment. See Harrington v. R.R. Comm'n, 375 S.W.2d 892, 895 (Tex. 
1964); Dale, 929 S.W.2d at 497-98.
V. Application of Law to the Facts
        During 
the trial on Appellees’ application for a turnover order, Appellees called 
Appellant as an adverse witness and questioned her about the federal court’s 
findings and her dealings with the money after she received it from Appellees. 
Additionally, Appellees offered expert witness testimony from CPA Gary Bishop 
and bankruptcy attorney St. Clair Newbern, III, who testified that Appellant 
could not establish her exemption claim. Appellees also offered twenty-nine 
exhibits from the federal trial, including a copy of the trial transcript and 
the final judgment. In support of her exemption claim, Appellant offered her own 
testimony, the testimony of her husband Cooke Leutwyler,[4] 
and the exhibits admitted during the federal trial.[5]  
Appellees argue that because the mistakenly paid funds do not belong to 
Appellant, she has no “right” to them and cannot claim that they are exempt 
as a “qualified rollover distribution under sections 31.002 and 42.0021.  
Appellees also argue that the evidence of Appellant’s movement of the 
mistakenly paid funds in and out of various accounts, converting it to cash, and 
the expenditures for personal items—the extent of which was discovered only 
after the federal court had signed a final judgment—further frustrate the 
credibility of Appellant’s exemption claims.
        A. Evidence Admitted During the Federal Trial
        During 
the federal trial, Appellant offered a letter into evidence to her from 
Appellees, which stated that “[a]s a result of the [QDRO] on file and [her] 
election, lump sum distributions from the Fixed Plan and the Variable Plan, 
[were] available to [her].” In a document signed by Appellant, a Wells Fargo 
Bank representative, and an authorized representative of American Airlines, 
Inc., Appellant directed Appellees to distribute the taxable proceeds of her 
lump sum payments from her former husband’s pension plans by wire transfer to 
a rollover IRA or other qualified retirement plan. After distributions of 
$167,445.67 and $390,601.34 were wired to her account at Wells Fargo Bank, she 
testified that the money was then wire transferred to an account at Securities 
of America, which Robert Gormly, Jr. (“Gormly”) managed.
        At 
the federal trial, Appellant did not dispute that Appellees had overpaid her 
because of an erroneous construction of the QDRO. Appellees offered the 
testimony of plan administrators Beverly Lotz and Diane Johnson as evidence of 
the amount Appellant equitably owed them as reimbursement. Johnson testified 
that under a correct reading of the QDRO, Appellees overpaid Appellant 
$401,834.08.
        Appellant 
testified to gifts and expenditures she allegedly made with the money Appellees 
disbursed to her, but she testified that the benefits remained in one principal 
account, the Securities America IRA. During cross-examination, however, 
Appellees elicited evidence that Appellant withdrew $9,060 from the account 
managed by Gormly between May and December of 1998. Appellees also directed the 
court to Appellant’s answers and supplemental answers to interrogatories as 
evidence of the withdrawals Appellant made in 1998 and 1999.
        Based 
on this evidence, the federal court found that Appellant was overpaid 
$410,540.32 and that she had not suffered any detrimental reliance by reason of 
the overpayment. On July 23, 2001, the federal court signed a final judgment 
ordering that Appellees recover $410,540.32 plus interest from Appellant. After 
the federal court entered its final judgment, Appellees conducted further 
discovery in connection with their attempts to enforce and collect on the 
judgment.
        B. Additional Evidence Discovered After the Federal Trial
        During 
this discovery period, Appellees learned that Appellant had transferred and 
converted funds from Appellees into cash before redepositing them in several 
bank accounts in the weeks preceding the federal trial. Appellant testified at 
the turnover proceeding that she deposited $558,039.01 in the Securities America 
account in 1998 and that in February and June of 2001, she withdrew money from 
that account and deposited it into another account at the First State Bank of 
Texas. Plaintiff’s Exhibits Nos. Seven and Eleven are checks from 
Appellant’s First State Bank account, signed by her, and made out to 
“Cash” in amounts of $144,560 and $316,000. Appellant admitted that she 
cashed these checks and put the currency in a safe in her home.[6]  
Further, Appellant acknowledged that to her knowledge neither she nor her lawyer 
had informed Appellees that she had more than $400,000 in cash at her home. 
Appellant conceded that the “money wasn’t in an IRA [in June],” but she 
claimed that “it was still IRA money.”
        After 
the federal trial, Appellees filed a motion to set aside fraudulent transfers 
and for an injunction. Appellant testified at the turnover proceeding that, in 
response to Appellees’ motion, she had filed a sworn declaration, in which she 
admitted that she had withdrawn a total of $463,128 from her accounts and 
deposited the funds in First State Bank of Texas. In her declaration, she also 
admitted that she paid back $202,000 into the Securities America account around 
July 19, 2001, that she rolled over $140,000 into an IRA at Morgan Stanley on 
July 20, 2001, and that she rolled over $57,000 into a Wells Fargo IRA on July 
23, 2001. Appellant’s declaration stated that $10,000 was redeposited in cash 
in the First State Bank account on July 12, 2001. Her federal declaration, 
however, never mentioned the conversion of the money to cash.
        At 
the turnover proceeding, Appellant confirmed these transactions by admitting 
that, after the federal court entered an injunction prohibiting her from making 
any further withdrawals, she continued to maintain the three retirement 
accounts—the Gormly plan, the Wells Fargo plan, and the Morgan Stanley 
plan—funded with $558,000 from American Airlines and $16,000 from a previous 
marriage. Appellant insisted that she created these accounts for tax purposes 
and not to defraud any of her creditors. Appellant testified that she had filed 
a 1998 tax return with the IRS and that they had not audited that return. 
Appellant stated that the IRS had never “issued a notice . . . that the 
rollover was not into a qualified plan.”[7]
        Appellant, 
however, admitted that she understood the federal court determined that she had 
been mistakenly overpaid $410,540.32 by Appellees and that she was required to 
repay that sum. She further agreed that she never appealed the federal court’s 
judgment. Finally, when asked whether she understood that the federal court’s 
judgment was final and that she knew she was obligated to pay, she replied, 
“Yes.”
        C. Appellant’s Exemption Argument
        Appellees 
argue that Appellant did not have a legal right to the pension funds that they 
mistakenly overpaid her. Appellees therefore contend that Appellant cannot claim 
a section 42.0021 exemption for the benefits because they do not belong to her. See 
Tex. Prop. Code Ann. § 42.0021. 
We mentioned above that the first sentence of section 42.0021(a) establishes an 
exemption with respect to
 
a person’s right to 
the assets held in or to receive payments, whether vested or not, under any 
stock bonus, pension, profit-sharing, or similar plan, including a retirement 
plan for self-employed individuals, and under any annuity or similar contract 
purchased with assets distributed from that type of plan, and under any 
retirement annuity or account described by Section 403(b) or 408A of the 
Internal Revenue Code of 1986, and under any individual retirement account or 
any individual retirement annuity, including a simplified employee pension plan.

  
Tex. Prop. Code Ann. § 42.0021(a) 
(emphasis supplied).
        Appellees 
offered evidence that they mistakenly overpaid Appellant. Appellant did not put 
forward any evidence to establish a right to the overpayments contained in the 
three accounts, which she claimed were exempt funds or proceeds of exempt funds. 
To the contrary, Appellant conceded that she knew the overpayment did not belong 
to her and that she was obligated to pay Appellees in accordance with the 
federal court’s final judgment.
        A 
party claiming an exemption under section 42.0021 bears the burden of proving 
that he or she is entitled to it. See id. § 42.0021; Lozano v. Lozano, 
975 S.W.2d 63, 67 (Tex. App.—Houston [14th Dist.] 1998, pet. 
denied); Dale, 929 S.W.2d at 498-99; Rucker v. Rucker, 810 S.W.2d 
793, 795-96 (Tex. App.—Houston [14th Dist.] 1991, writ denied). 
Appellant has not met this burden. Because “[a]n exemption is a right given by 
law to a debtor to retain a portion of his [or her] property free from the 
claims of creditors,” we hold that Appellant cannot claim as exempt the 
portion of benefits to which she has no legal right. Pickens v. Pickens, 
125 Tex. 410, 83 S.W.2d 951, 954 (1935); see also In re Swift, 124 B.R. 
475, 481 (Bankr. W.D. Tex. 1991) (finding computer system that was not the 
property of the debtor could not be included in the debtor’s exemptions); Day, 
112 F. Supp. 2d at 837-39 (holding plaintiff had no legal right to benefits 
erroneously distributed pursuant to a void QDRO).
        Further, 
as Appellees argue, the funds mistakenly distributed to Appellant did not 
constitute an “amount[] qualifying as a nontaxble rollover contribution,” 
which is a necessary component of the section 42.0021 exemption. See Tex. Prop. Code Ann. § 42.0021(b). 
Because the amount received by Appellant was incorrectly calculated, the portion 
constituting the mistaken amount did not qualify as an eligible rollover 
distribution under section 402(c) of the Internal Revenue Code. 26 U.S.C.A.§ 
402(c)(4) (West Supp. 2003) (describing eligible rollover distributions). 
Rather, the mistaken amount was an excess rollover contribution as defined by 
section 408(d)(5). Id. § 408(d)(5). The three accounts, which were 
comprised solely of excess rollover contributions, therefore did not qualify as 
IRAs under the terms of Internal Revenue Code section 408(a). See 26 
U.S.C.A. § 408(a).[8]
        Appellant 
directs us to In re Youngblood in support of her argument that only the 
IRS can determine that a plan is unqualified and that the trial court abused its 
discretion in ordering turnover relief in the absence of such a finding. 29 F.3d 
225, 229 (5th Cir. 1994). We find Appellant’s reliance on Youngblood to 
be misplaced. Unlike Youngblood, in the case at bar, there is a final 
judgment from a federal court determining that the distributions from Appellees 
were made by mistake. Appellant never appealed this determination, and she 
admitted that she had been overpaid and was obligated to pay back the mistakenly 
paid funds to Appellees.
        Based 
on the record before us, under the applicable standard of review, we hold that 
the trial court did not abuse its discretion in rejecting Appellant’s 
exemption claims and in ordering turnover relief. See Tex. Prop. Code Ann. § 42.0021; Beaumont 
Bank, 806 S.W.2d at 226; DeVore, 908 S.W.2d at 608. We therefore 
overrule Appellant’s two issues.
VI. Appellate Attorneys’ Fees
        The 
trial court’s turnover order provides that “[i]n the event of an appeal by 
[Appellant], in the Court of Appeals, if the appeal is successful, [Appellees] 
will further be entitled to $3,500.00 as reasonable attorneys’ fees.” 
Appellees have requested that we affirm the conditional award of these appellate 
attorneys’ fees. It is well-settled that the trial court’s award of 
attorneys’ fees may include appellate attorneys’ fees. Neal v. SMC Corp., 
99 S.W.3d 813, 818 (Tex. App.—Dallas 2003, no pet.) (citing Siegler v. 
Williams, 658 S.W.2d 236, 241 (Tex. App.—Houston [1st Dist.] 
1983, no writ)). To support the award of appellate attorneys’ fees, there must 
be evidence of the reasonableness of the fees pertaining to the appellate work, 
and the trial court must condition the award of attorneys’ fees to an appellee 
upon the appellant’s unsuccessful appeal. Id. We hold that Appellees 
are entitled to $3,500 for appellate attorneys’ fees. See id.
VII. Conclusion
        Having 
overruled both of Appellant’s issues and having addressed Appellees’ 
requested appellate attorneys’ fees, we affirm the trial court’s judgment.
 
  
                                                          ANNE 
GARDNER
                                                          JUSTICE

   
PANEL B:   DAUPHINOT, 
GARDNER, and WALKER, JJ.
 
DELIVERED: February 26, 2004


NOTES
1.  
The federal court also stated that it found that Appellees “were negligent in 
paying her those benefits,” but it did not think that was a “reason for 
denying them equitable reimbursement under the facts of this case.”
2.  
On May 31, 2002, the trial court issued judgment nunc pro tunc to correct 
a clerical error in the numbering of an account listed in the turnover order.
3.  
Because Appellant had not complied with the turnover order, Appellees filed a 
contempt motion. This court abated the appeal, remanded the case to the trial 
court, and directed the court to conduct a hearing on Appellees motion. 
Following the show cause hearing, Appellees notified this court of the 
withdrawal of their motion for contempt.
4.  
Cooke Leutwyler identified Defendant’s Exhibit One as the couple’s joint 
income tax return for 1998, which he signed and filed.
5.  
The exhibits consisted of Cooke Leutwyler and Appellant’s 1998 federal income 
tax return, a letter to Appellant from Beverly Lotz, pension administration 
reports, an American Funds IRA application, an application and information 
concerning a Wells Fargo IRA plan, a new account confirmation from American 
Funds, and a Morgan Stanley Dean Witter IRA-2000 Adoption Agreement.
6.  
During her deposition, Appellant admitted that she placed almost $500,000 under 
her bed. Appellant testified at the turnover proceedings, however, that she 
placed the money in a safe at her house.
7.  
We agree with the following statement from Appellees’ brief:
[T]he 
IRS’s treatment to date of [Appellant’s] 1998 return cannot be taken as an 
imprimatur of the purported ‘qualified’ status of the Plan’s mistaken 
distribution benefits. Since the filing of [Appellant’s] 1998 return, the IRS 
has not been made aware of the mistaken nature of the distribution and thereby 
afforded the necessary information to act on the tax consequences of this 
post-filing event.
8.  
Section 408(a) of the Internal Revenue Code states that an IRA is a trust 
created in the United States for the exclusive benefit of an individual or his 
or her beneficiaries, which meets all of several requirements. 26 U.S.C.A. § 
408(a).